Slip Op. 15-24

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| CP KELCO OY and CP KELCO US, INC., <br><br>      Plaintiffs,<br><br>  v.<br><br>UNITED STATES,<br><br>      Defendant,<br><br>  and<br><br>ASHLAND SPECIALTY INGREDIENTS, G.P.,<br><br>      Defendant-Intervenor. | Before: Richard W. Goldberg, Senior Judge<br>Court No. 13-00079<br><br>**PUBLIC VERSION** |

**OPINION**

  *Matthew L. Kanna*, *Nancy A. Noonan*, and *Tina Termei*, Arent Fox LLP, of Washington, DC, for plaintiff.

  *L. Misha Preheim*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for defendant. With him on the brief were *Joyce R. Branda*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Reginald T. Blades, Jr.*, Assistant Director. Of counsel on the brief was *Aman Kakar*, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, DC.

  *Edward M. Lebow*, Haynes and Boone, LLP, of Washington, DC, for defendant-intervenor Ashland Specialty Ingredients, G.P.

  Goldberg, Senior Judge: This case returns after a succinct remand. In its previous opinion, the court invalidated the decision of the Department of Commerce ("Commerce" or "the agency") to calculate antidumping duties for plaintiffs CP Kelco Oy and CP Kelco US, Inc. (collectively "Kelco") using the average-to-transactional methodology. The court found

Case 1:13-cv-00079-RWG   Document 89   Filed 03/31/15   Page 2 of 11

Court No. 13-00079                                                                                      Page 2

Commerce acted arbitrarily by failing to explain why Kelco's "targeted" sales were sufficient to merit the average-to-transactional treatment. *See CP Kelco Oy v. United States*, 38 CIT __, __, 978 F. Supp. 2d 1315, 1327−29 (2014). Now the agency has furnished the explanation required, and the court sustains the decision to use the average-to-transactional method to craft Kelco's antidumping rate.

## BACKGROUND

The court presumes familiarity with its prior opinion, including the exposition of Commerce's margin calculation methods and the targeted dumping test. The abridged facts that follow will suffice for the sake of this decision.

In 2011, Commerce began an administrative review of an antidumping duty order on carboxymethylcellulose from Finland. *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 76 Fed. Reg. 53,404, 53,405 (Dep't Commerce Aug. 26, 2011). During the review, Commerce considered whether to apply its default average-to-average methodology ("A-A"), or its exceptional average-to-transactional methodology ("A-T"), to render Kelco's dumping margins. To guide its decision, Commerce followed the statutory framework in § 777A(d)(1)(B) of the Tariff Act of 1930, 19 U.S.C. § 1677f-1(d)(1)(B) (2012). *See Purified Carboxymethylcellulose from Finland*, 78 Fed. Reg. 11,817, 11,817 (Dep't Commerce Feb. 20, 2013) (final admin. review) ("*Final Results*"); Issues & Decision Mem. ("I&D Mem.") at 6, 8–10, PD 80 (Feb. 6, 2013).

That provision, known colloquially as the "targeted dumping" statute, reads as follows:

(B) Exception

The administering authority may determine whether the subject merchandise is being sold in the United States at less than fair value by comparing the weighted average of the normal values to the export prices (or constructed export prices) of individual transactions for comparable merchandise, if--

> (i) there is a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time, and
>
> (ii) the administering authority explains why such differences cannot be taken into account using a method described in paragraph (1)(A)(i) or (ii) [i.e., the A-A or transactional-to-transactional methods].

19 U.S.C. § 1677f-1(d)(1)(B).

To perform this inquiry, Commerce first applied the so-called *Nails* test to Kelco's U.S. sales. The *Nails* test identifies targeted transactions, or patterns of export prices that differ significantly among purchasers, regions, or time periods. *See id.* § 1677f-1(d)(1)(B)(i); *Mid Continent Nail Corp. v. United States*, 34 CIT __, __, 712 F. Supp. 2d 1370, 1373−74 (2010) (explaining the *Nails* test). Then, after finding that Kelco targeted [[ ]] percent of its sales by quantity and [[ ]] percent by value, Commerce concluded that the targeting was more than *de minimis*, comprising a fraction of total U.S. sales sufficient to merit further analysis. *See* Analysis of Data Submitted by CP Kelco Oy & CP Kelco U.S. Inc. at 2, CD 195 (Feb. 11, 2013) (naming ratios of Kelco's targeted to total U.S. sales); I&D Mem. at 9–10 (finding sufficient volume of sales passed *Nails* test). The agency did not name the quantum of sales needed to clear the *de minimis* bar.

Despite this ambiguity, Commerce moved to the second step of the statutory inquiry, which asks whether A-A cannot account for targeted sales. *See* 19 U.S.C. § 1677f-1(d)(1)(B)(ii). The agency found it could not. A-A yielded a "meaningfully" lower antidumping rate than A-T, so Commerce, in its discretion, applied A-T to Kelco's sales to form a 12.06 percent final rate. *Final Results* at 11,817 (final rate); I&D Mem. at 9 (meaningful difference test).

Kelco filed suit at the Court of International Trade on February 26, 2013. Summons, ECF No. 1. In its brief Kelco raised a host of claims, only one of which survived judicial review.

After dismissing Kelco's arguments regarding Commerce's authority to conduct targeting inquiries in reviews and the legality of the *Nails* test, the court invalidated Commerce's *de minimis* finding as arbitrary. *Kelco*, 38 CIT at __, 978 F. Supp. 2d at 1327–29. The court's criticism was twofold. First, the court noted that "Commerce never explained what purpose the *de minimis* test serves in the statutory scheme." *Id.* at __, 978 F. Supp. 2d at 1328. It was unclear from the record whether the *de minimis* analysis helped to identify a pattern of targeting under § 1677f-1(d)(1)(B)(i), or whether the test guided the agency's discretion under § 1677f-1(d)(1)(B)(ii) to use A-T once targeting was found. Second, the court faulted Commerce for failing to identify "the quantum of an exporter's sales that must be targeted to fall above or below the *de minimis* threshold." *Id.* Because Commerce never articulated "the basis on which the [agency] exercised its expert discretion," the court remanded for Commerce to explain its construction and application of the *de minimis* test. *Id.* at __, 978 F. Supp. 2d at 1327 (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 167 (1962)) (internal quotation marks omitted).

On remand, Commerce provided the explanation required. *See* Final Results of Redetermination Pursuant to Ct. Remand, ECF No. 72 ("Remand Results"). First, Commerce said the *de minimis* test served both to identify a pattern of targeting, as required under § 1677f-1(d)(1)(B)(i), and to guide Commerce's discretion to apply A-T, as allowed under § 1677f-1(d)(1)(B)(ii). *Id.* at 9–15. Second, in response to the court's request to identify the quantum of sales that cleared the *de minimis* bar, Commerce declared that targeted sales were more than *de minimis* if they comprised more than five percent of total U.S. sales during the review period. *Id.* at 15–19. Commerce drew this threshold from statutory provisions and regulations that use the

same figure in other contexts, and noted that the threshold corroborated with Commerce's experience in administering the targeted dumping test. *See id.* at 18–19.

Having rendered this explanation, Commerce again held that Kelco targeted its sales in a volume sufficient to merit consideration of the A-T remedy. After comparing Kelco's A-A rate with its A-T rate, and finding a meaningful difference between the two, Commerce applied A-T to all of Kelco's sales for a 12.06 percent final rate. *See id.* at 9−10, 16, 20–21.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction to hear this appeal under 28 U.S.C. § 1581(c). The court will sustain the agency's decisions unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

The court now sustains the Remand Results. In its previous opinion, the court invalidated Commerce's targeted dumping decision not because of patent flaws in the agency's reasoning, but because the agency offered no reasoning at all regarding the *de minimis* test's quantitative contours and role in the statute. *Kelco*, 38 CIT at __, 978 F. Supp. 2d at 1327–29. Now Commerce has explained itself to the court's satisfaction, and though reasonable minds may differ over the wisdom of Commerce's choice, the decision merits deference.

**I.      Commerce Reasonably Explained the *De Minimis* Test's Role**

To begin, the court holds that Commerce reasonably "explained what purpose the *de minimis* test serves in the statutory scheme." *Id.* at 1328. In the agency's view, the role is twofold. First, the inquiry helps to identify "a pattern of prices that differ significantly by purchaser, region or period of time" among respondent's U.S. sales. Remand Results 9. Of course, the statute does not say whether Commerce must search out the pattern among all

reviewed sales, as it did below, or only among sales to alleged targets. *See* 19 U.S.C. § 1677f-1(d)(1)(B)(i). Commerce has taken conflicting positions on this issue in the past.[1] But whatever its prior views, the agency acted sensibly here to require that the volume of targeted sales comprise more than a token part of U.S. sales. To form a "pattern," a "mode of behavior or series of acts," such as selective low-cost sales, must be "recognizably consistent." Black's Law Dictionary 1308 (10th ed. 2014). By checking to see whether Kelco's targeting encompassed more than a *de minimis* share of total sales, Commerce carried its duty to find a recognizable, and hence remediable, pattern of targeting among all reviewed transactions.

Second, the agency explained that the *de minimis* inquiry informs its choice to impose A-T after finding targeting. Remand Results 13−15. Under the statute, Commerce "may determine" dumping margins using A-T if a respondent's sales meet the criteria in § 1677f-1(d)(1)(B)—in short, the law commits the decision to apply A-T to the agency's judgment. *See Timken Co. v. United States*, 38 CIT __, __, 968 F. Supp. 2d 1279, 1287−88 (2014). But even given this discretion, it was wise for Commerce to consider the ratio of targeted to untargeted sales before invoking A-T. Having withdrawn a regulation called the limiting rule in 2008, Commerce applied A-T to all sales, both targeted and untargeted, during the review in question. *See* I&D Mem. at 9−10; *see also Apex Frozen Foods Private Ltd. v. United States*, 38 CIT __, __, 37 F. Supp. 3d 1286, 1301−03 (2014) (explaining that Commerce applied A-T to all sales after 2008). To avoid imposing A-T on untargeted sales without cause, the agency first ensured

---

[1] In some proceedings, Commerce found a pattern of significantly differing prices only where targeted sales comprised a sufficient part of total U.S. sales. *See, e.g.*, *Certain Stilbenic Optical Brightening Agents from Taiwan*, 77 Fed. Reg. 17,027, 17,027−28 (Dep't Commerce Mar. 23, 2012) (final determination); *Ball Bearings and Parts Thereof from France, Germany, and Italy*, 77 Fed. Reg. 73,415 (Dep't Commerce Dec. 10, 2012) (final admin. review) and accompanying I&D Mem at cmt. 1 ("*Ball Bearings*"). In other proceedings, Commerce found a pattern of prices without regard to the ratio of targeted sales to total sales. *See, e.g.*, *High Pressure Steel Cylinders from the People's Republic of China*, 77 Fed. Reg. 26,739 (Dep't Commerce May 7, 2012) (final determination) and accompanying I&D Mem. at cmt. IV; *Certain Steel Nails from the United Arab Emirates*, 77 Fed. Reg. 17,029 (Dep't Commerce Mar. 23, 2012) (final determination) and accompanying I&D Mem. at cmt. 3. The latter formula is not under scrutiny here, however, and the former approach is reasonable in its own right.

that Kelco's targeting was more than *de minimis*, or sufficient to merit a broad remedy. This was a fair approach, which Kelco does not protest as a general matter. *See* Pls.' Objections to Remand Redetermination 2−5, ECF No. 80 ("Pls.' Objections") (objecting to the five-percent threshold, not the *de minimis* test itself). The court sustains the *de minimis* test as a reasonable interpretation of the law and a prudent guide to Commerce's discretion.

## II.   Commerce Reasonably Defined the De Minimis Threshold at Five Percent

The court also sustains the five-percent threshold Commerce chose for its *de minimis* test. *See* Remand Results 15−19; *Kelco*, 38 CIT at __, 978 F. Supp. 2d at 1330 (ordering agency to define quantum of sales that are more than *de minimis*). One should recognize, of course, that this threshold is a line in the sand: Commerce might have picked a different number to effectuate the statute's purpose, with reasonable results. *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844−45 (1984) (warning courts not to substitute their own interpretation of statute for agency's reasonable construction). Yet because the agency's choice does not run afoul of the statute and is not arbitrary, the court will defer to Commerce despite the possibility of alternatives. *See Mid Continent Nail*, 34 CIT at __, 712 F. Supp. 2d at 1378−79.

On remand, Commerce reported that it measures significance with five-percent tests in many contexts. Remand Results 15−16. For example, it uses a five-percent threshold to decide whether home market sales can make a viable normal value. *See* 19 U.S.C. § 1677b(a)(1)(C). If a respondent's home market sales amount to less than five percent of its U.S. sales by volume or value, then Commerce normally deems that market too thin to use in finding dumping margins. If home market sales amount to five percent or more of U.S. sales by volume or value, however, then the agency presumes the home market prices are comparable to U.S. export prices. *See id.*; Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316,

vol. 1, at 821−22 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4161−62 ("SAA"). The statute outlines a similar test to use when Commerce assembles normal value from third-country data. *See* 19 U.S.C. § 1677b(a)(1)(B)(ii)(II); SAA at 822. In like manner, it was reasonable for Commerce to find a representative "pattern" of targeting when targeted sales exceed five percent of total U.S. sales by volume. *See* 19 U.S.C. § 1677f-1(d)(1)(B).

Other five-percent tests support this view. The regulations, for instance, permit Commerce to set normal value using home-market data from an exporter's affiliate, but only if the affiliate's sales make up five percent or more of all home sales. 19 C.F.R. § 351.403(d) (2015); *see also China Steel Corp. v. United States*, 28 CIT 38, 46, 306 F. Supp. 2d 1291, 1300 (2004) (allowing use of affiliate data to form normal value where affiliate sales exceeded five percent, "a significant percentage"). Commerce also uses a five-percent threshold to ferret out targeting under the *Nails* test. If Commerce locates a "pattern" of prices below one standard deviation of the mean by control number, it calls those price differences "significant" if the gap between the weighted-average price to the alleged target and the weighted-average price to the next higher untargeted group exceeds the average gap between untargeted groups for five percent of sales to the alleged target. *See* I&D Mem. at 9. Commerce sensibly used a similar test to decide if Kelco's sales formed a pattern of differing prices meriting the A-T remedy.[2]

---

[2] Commerce adds that it forged its five-percent threshold in past cases. If it did, the court has no way of knowing. In prior proceedings, Commerce scrupulously avoided naming the quantum of targeted sales needed to clear the *de minimis* bar. The agency also failed to reveal the ratio of targeted to total U.S. sales from individual companies, probably to preserve confidentiality. *See, e.g.*, *Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea*, 78 Fed. Reg. 16,247 (Dep't Commerce Mar. 14, 2013) (final admin. review) and accompanying I&D Mem. at cmt. 1(C)(6); *Polyethylene Terephthalate Film, Sheet, and Strip from India*, 78 Fed. Reg. 9670 (Dep't Commerce Feb. 11, 2013) (final admin. review) and accompanying I&D Mem. at cmt. 1; *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China*, 78 Fed. Reg. 3396 (Dep't Commerce Jan. 16, 2013) (final admin. review) and accompanying I&D Mem. at cmt. 1; *Ball Bearings*, 77 Fed. Reg. at 73,415 and accompanying I&D Mem. at cmt. 1; *Circular Welded Carbon Steel Pipes and Tubes from Turkey*, 77 Fed. Reg. 72,818 (Dep't Commerce Dec. 6, 2012) (final admin. review) and accompanying I&D Mem. at cmt. 1. Because none of these proceedings revealed the contours of Commerce's *de minimis* test, they do little to aid judicial review. *See Burlington*, 371 U.S. at 167.

Kelco counters that it would have been more appropriate for Commerce to set the *de minimis* threshold at twenty percent. Pls.' Objections 5. Under 19 U.S.C. § 1677b(b)(1), Commerce may exclude from its normal value calculation any below-cost home market sales made "within an extended period of time in substantial quantities." The statute defines "substantial quantities" of below-cost sales as transactions encompassing twenty percent "or more of the volume of sales under consideration for the determination of normal value." 19 U.S.C. § 1677b(b)(2)(C)(i). Yet as the United States suggests in its response on remand, the twenty-percent threshold does not measure the representativeness of normal value data, like 19 U.S.C. § 1677b(a)(1) (market viability) or 19 C.F.R. 351.403(d) (affiliate sales). Def.'s Resp. to Pls.' Cmts. on Final Results of Remand Redetermination 8–9, ECF No. 84. Instead, the twenty-percent threshold indicates whether below-cost sales render home market prices *unrepresentative* of normal value. *See NSK Ltd. v. United States*, 28 CIT 1535, 1551−53, 346 F. Supp. 2d 1312, 1327–29 (2004) (suggesting that purpose of cost-of-production provision is to "evaluate the rationality of exporters [sic] pricing practices"). Furthermore, even if a twenty-percent threshold correctly identified significant targeting, that would not mean Commerce's choice was unreasonable. When Commerce is met with equally plausible alternatives, it may choose the approach that it thinks best effectuates the statute's purpose. *See Chevron*, 467 U.S. at 844−45. Here, the agency used a five-percent test instead of a twenty-percent test to identify a pattern of targeting, and the court will defer to the agency's reasonable preference.

### III.   Kelco Waived Any Argument Regarding the Meaningful Difference Test

Finally, Kelco claims that the agency failed to explain the "meaningful difference" test conducted on remand. Pls.' Objections 5–6. After finding that a sufficient number of Kelco's U.S. sales were targeted, Commerce had to decide whether A-A could account for that targeting

under 19 U.S.C. § 1677f-1(d)(1)(B)(ii).  *See* Remand Results 16.  To do so, Commerce compared Kelco's weighted-average dumping margin as rendered under A-A and A-T.  Then, after discovering a meaningful difference between the two rates, the agency applied A-T to yield a final rate.  *See id.*  Kelco claims that Commerce acted arbitrarily by neglecting to define what "meaningful" means in this context.

The court will not consider this claim, however, because Kelco did not raise it before the agency, in the complaint, or in the original briefs.  *See* I&D Mem. at 7–8; Complaint 6–7, ECF No. 4; Mem. of L. in Support of Pls.' R. 56.2 Mot. For J. upon Agency R. 1–2, ECF No. 28.  Commerce made similar "meaningful difference" findings in the post-preliminary results and *Final Results*, *see* Post-Prelim. Targeted Dumping Analysis Mem. at 3, PD 68 (Dec. 26, 2012); I&D Mem. 9–10, and if Kelco wished to challenge the test, it should have done so at the earliest opportunity, *see* 28 U.S.C. § 2637(d) (requiring exhaustion of administrative remedies); *Casa de Cambio Comdiv S.A., de C.V. v. United States*, 291 F.3d 1356, 1366 (Fed. Cir. 2002) (rejecting claim not raised in complaint).

The court also disagrees that the meaningful difference test became "subject to judicial review" when Commerce used it to set a rate on remand.  Pls.' Objections 6.  Though Kelco claims otherwise, remand is not the time to litigate new claims that could have been raised in prior proceedings.  *See Bridgestone Americas, Inc. v. United States*, 34 CIT __, __, 710 F. Supp. 2d 1359, 1365–67 (2010) (rejecting argument raised after remand).  What is more, the court did not ask Commerce to revisit the meaningful difference test in the remand order.  *See Kelco*, 38 CIT at __, 978 F. Supp. 2d at 1330.  The court thus declines to entertain Kelco's meaningful difference argument—whatever its merits—because it was made too late.[3]

---

[3] Kelco's meaningful difference challenge would fail in any event.  The court has found that the disparity between A-A and A-T rates is "meaningful" if it is more than *de minimis*, *see Apex*, 38 CIT at (footnote continued)

## **CONCLUSION**

In its prior opinion, the court faulted Commerce for failing to explain the purpose and contours of the *de minimis* test. Commerce has now provided an explanation that is in harmony with the law and evidence. The court sustains the agency's remand redetermination, and judgment will enter accordingly.

/s/ Richard W. Goldberg
Richard W. Goldberg
Senior Judge

Dated:  March 25, 2015
             New York, New York

---

__, 37 F. Supp. 3d at 1299−1300 (sustaining "meaningful difference" of 0.5 percentage points), and the difference between Kelco's A-A rate and A-T rate (applied to all sales) certainly clears this bar, *see Final Results* at 11,817 (giving Kelco's A-T rate); Pls.' Objections 6 (giving Kelco's A-A rate); Remand Results 9−10 (noting Commerce applies A-T to all sales when finding A-T rate).